UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LUCAS BUTALA,                                    Case No. 13-CV-0633 (PJS/TNL)

                    Plaintiff,

v.                                                          ORDER

CARI GERLICHER, Office of Special
Investigations Director, sued in her individual
capacity only; MICHAEL SMITH, Office of
Special Investigations Unit Deputy Director,
sued in his individual capacity only; JOE
DUROCHER, Case Manager, sued in his
individual capacity only; BARBARA
STOLTZ, sued in her individual capacity
only; JANE DOE, Correctional Sergeant,
sued in her individual capacity only; JOHN
DOE, Prison Official, sued in his individual
capacity only; JANE DOE, Prison Official,
sued in her individual capacity only,

                    Defendants.

Terrence P. Duggins, DUGGINS LAW FIRM, LLC, for plaintiff.

Jacob D. Campion, MINNESOTA ATTORNEY GENERAL'S OFFICE, for
defendants Cari Gerlicher, Michael Smith, Joe Durocher, and Barbara Stoltz.

In this lawsuit, plaintiff Lucas Butala (a prisoner) brings various federal and state claims

against various prison officials.  The named defendants have moved for summary judgment on

Butala's federal claims on the ground that Butala failed to exhaust administrative remedies.  The

named defendants also argue that, in the event that their motion is granted and the federal claims

are dismissed, the Court should decline to exercise supplemental jurisdiction over Butala's state-

law claims.

For the reasons stated below, the Court grants the motion and dismisses Butala's federal

claims against the named defendants for failure to exhaust administrative remedies.  But because

Butala must be given an opportunity to identify the unnamed defendants, the Court cannot yet dismiss this entire action.  Thus, for the time being, the Court will retain jurisdiction over Butala's state-law claims — although, as discussed below, the Court will not exercise supplemental jurisdiction over those claims if the unnamed defendants are also granted summary judgment on the federal claims.

## I.  BACKGROUND

### A.  Butala's Transfer and the Assaults

As alleged in Butala's complaint (and supplemented by the record), the events that gave rise to this lawsuit are as follows:

Butala was incarcerated by the Minnesota Department of Corrections ("DOC") in 2000 after he was convicted of killing two men by dousing them with gasoline and setting them on fire.  In March 2008, Butala was transferred from MCF-Rush City[1] to MCF-Oak Park Heights ("MCF-OPH").  Butala alleges that prison officials transferred him despite knowing that Butala would be in danger from prison gangs at MCF-OPH and despite knowing that Butala's "custody credit points" did not warrant his incarceration at a maximum-security facility such as MCF-OPH.

While at MCF-OPH, Butala was assaulted twice: once in December 2008 and once in January 2009.[2]  After the first assault, Butala was placed in segregation.  Butala notified defendants Joe Durocher and Barbara Stoltz that he would be in danger if he was placed back

---

[1]"MCF" stands for "Minnesota Correctional Facility."

[2]Butala's complaint alleges that he was assaulted on December 17; the record indicates that the assault actually took place on December 10.  *See* Butala Aff. ¶ 9; Plf.'s Ex. 11.

into the general population.  Durocher and Stoltz, in turn, demanded that Butala provide the

names of the inmates who had threatened him.  Butala explained that two prison gangs had

issued a "green light" on him (i.e., had directed gang members to attack him), which meant that

he was in danger from every member of both gangs.  Because Butala would not provide specific

names, he was released back into the general population, where he was again assaulted on

January 15, 2009.  Butala suffered serious injuries from the second assault.  Ultimately, in 2010,

Butala was transferred to a prison in Wisconsin, where he remains incarcerated.

On the basis of these events, Butala asserts three substantive claims — two federal and

one state:[3]  (1) defendants transferred him to MCF-OPH even though he did not meet the

custody-credit guidelines for incarceration at that facility, in violation of the Fifth, Eighth, and

Fourteenth Amendments;[4] (2) defendants knowingly failed to protect him from being assaulted at

MCF-OPH, in violation of the Eighth and Fourteenth Amendments; and (3) defendants

negligently failed to protect him from foreseeable harm and negligently placed him at MCF-OPH

even though he did not meet the custody-credit guidelines for incarceration in that facility.

---

[3]Butala's complaint contains four numbered claims.  The first three substantially overlap and the fourth is for punitive damages, which is not a separate cause of action.  The Court discusses Butala's federal claim relating to the assaults separately from his federal claim relating to the transfer.  Butala's argument that these claims are intertwined for exhaustion purposes is discussed below.

[4]Curiously, Butala cites the Due Process Clause of the Fifth Amendment as "made applicable to the states by the Fourteenth Amendment," rather than simply citing the Fourteenth Amendment.

*B.  The DOC's Grievance Procedure*

Under the DOC's grievance procedure, a prisoner must first attempt to informally resolve his grievance by submitting a "kite," which is a printed form that prisoners use to communicate with staff.  Ebeling Aff. Ex. 1 at 1.  If the prisoner is dissatisfied with the response to his kite, he may initiate the formal grievance procedure by completing an "Offender Grievance form" and submitting the form to the facility grievance coordinator.  *Id.* at 2.  If the prisoner's grievance is procedurally defective in some way, the coordinator returns it to the prisoner and explains the nature of the problem.  *Id.*; *see* Plf.'s Ex. 6.  If the grievance is not returned, the coordinator logs it into a database and notifies the prisoner of the date that his grievance was logged.  Ebeling Aff. Ex. 1 at 2.

On the Offender Grievance form, the prisoner must identify a single complaint and the relief he seeks.  *Id.*  The prisoner must also attach all kites showing his attempts to informally resolve his complaint.  *Id.*  Grievances are decided by the warden or his designee; the prisoner is entitled to written notice of the decision within 20 working days (or 40 working days if the prisoner receives notice of an extension).  *Id.*  If no written notice is given within the required time, the grievance is deemed dismissed.  *Id.* at 3.

To appeal an adverse decision, the prisoner must submit an appeal form to the central-office grievance-appeal coordinator ("appeal coordinator").  *Id.* at 3.  Appeals must be submitted within 15 working days of the date that the warden or his designee signed the response to the grievance.  *Id.*  As with the initial grievance, the appeal will be returned to the prisoner if it is procedurally defective in some way.  *Id.*  Appeals are ordinarily decided by the commissioner's assistant or deputy.  *Id.* at 4. If the prisoner does not receive a decision on his appeal within

20 working days (or 40 working days if he is notified of an extension), the prisoner may report

the matter to the commissioner for a resolution. *Id.* After the appeal is resolved, there are no

further appeals. *Id.*

There is an alternative procedure for prisoners who fear that they would be endangered if

their grievance became known to staff at their place of incarceration. Such prisoners may bypass

the facility grievance coordinator and instead submit their formal grievance directly to the appeal

coordinator. *Id.* at 3. Under these circumstances, there is no second level of appeal; the appeal

coordinator makes the one and only decision on the grievance. *Id.* at 3.

*C. Butala's Written Complaints and Use of the Grievance Procedure*

On March 9, 2008, after Butala learned that he would be transferred to MCF-OPH, he

sent a letter to the "Internal Affairs Central Office" and submitted kites to a staff member and to

the warden. Plf.'s Exs. 3-5. These documents are somewhat difficult to follow, but they seem to

protest that Butala was being (wrongly) accused of ordering an assault on another inmate, and

they seem to argue that this accusation was made as part of a campaign to retaliate against Butala

because he had engaged in a romantic relationship with a member of the prison staff. The letter

and the kite to the warden explicitly sought to stop the pending transfer; the kite to the staff

member did not expressly mention the pending transfer, but the staff member apparently

understood it to concern that issue, as he responded that "my previous response still appl[ie]s you

will be transferred to another facility soon . . . ." Plf.'s Ex. 4.[5] The kites did not mention any

threats or fear of violence at MCF-OPH, but the letter to internal affairs stated that "I have a lot

---

[5]The "previous response" apparently concerned a March 4, 2008 kite from Butala, which
defendants, but not Butala, submitted to the Court. *See* Ebeling Aff. Ex. 2 at 10.

of time to do and I don't want it to be where I will have to fear for my well-being." Plf.'s Ex. 3. Neither the kites nor the letter said a word about Butala's custody points.

On the same day or shortly thereafter, Butala submitted a formal grievance directly to the appeal coordinator, protesting the alleged retaliation against him and asking that the pending transfer be delayed while his claims could be investigated.[6] Plf.'s Ex. 6. Butala also complained about being sent to MCF-OPH because his life would be in "serious danger" from his rivals. *Id.* Butala's formal grievance, like his informal kites and letter, did not say a word about Butala's custody points.

On March 26, the DOC notified Butala that it had logged his grievance, which it labeled #3527. Plf.'s Ex. 7. On April 1, Butala wrote a letter in response to this notification, again objecting to his transfer for various reasons and for the first time mentioning that his 22 custody points are "a step away from Medium custody." Plf.'s Ex. 8. Butala requested that he be returned to MCF-Rush City. *Id.*

On April 2, the DOC notified Butala by letter that his grievance had been dismissed; the record establishes that this decision was reached and signed on March 31, the day before Butala wrote his April 1 letter. Ebeling Aff. Ex. 2 at 5-7; Plf.'s Exs. 6, 9; *see also* Butala Aff. ¶ 7. On April 4, the DOC responded to Butala's April 1 letter and made clear that the DOC deemed the letter to be an improper attempt to appeal the March 31 decision. (Recall that when a prisoner bypasses the facility grievance coordinator and instead submits his formal grievance directly to

---

[6]The grievance was logged on March 26, but the text of the grievance indicates that it was written on March 9.

the appeal coordinator — as Butala did — the decision of the appeal coordinator is final and

cannot be appealed.  Ebeling Aff. Ex. 1 at 3.)  Specifically, the DOC said the following:

> Your offender grievance #3527 has been investigated.  All
> decisions made on grievances processed by central office will be
> final.  There will be no second level of appeal.
>
> Please refer to the Department of Corrections Policy 303.100 for
> the proper grievance procedure.

Plf.'s Ex. 10.  Butala was transferred to MCF-OPH and, as far as the record reflects, had no

further written communications with prison officials about his transfer over the next eight

months.

On December 10, 2008, Butala was assaulted at MCF-OPH and, as a result, was placed in

segregation.  Butala Aff. ¶ 9; Plf.'s Ex. 11.  The record indicates that Butala sent a letter dated

December 18, 2008 to the Office of Special Investigations.  Plf.'s Ex. 12.  Butala's December 18

letter is not in the record, but the director of that office (defendant Cari Gerlicher) responded by

letter dated January 6, 2009.  *Id.*  Gerlicher's response stated:  "I received your letter dated

December 18, 2008, and again my position on your literature request has not and will not change.

This matter is closed."  *Id.*  Gerlicher went on to address phone calls that she had received from

Butala's mother, apparently about concerns for Butala's safety.  *Id.*  The letter also stated:  "You

were not moved to MCF-OPH from MCF-RC because of a relationship with a staff and you were

never told that by Special Investigator Mark Uner or anyone else from OSI."  *Id.*

On January 15, 2009, Butala was again assaulted and suffered serious injuries to his face

and throat.  Butala Aff. ¶ 17;[7] Plf.'s Ex. 14.  A little over a month later, on February 24, Butala

---

[7]Butala's affidavit, which is partially illegible, contains two paragraphs numbered "17."

submitted a kite to the Office of Special Investigations asking that he be told the reason for his transfer to MCF-OPH.  Plf.'s Ex. 15.  As Butala put it, "I have asked this before, and want to see if the answer is still the same because I have conflicting stories being told to me."  *Id.*  The response stated that Butala was transferred because he was ordering assaults on other inmates and not because of his relationship with a staff member.  *Id.*

Two days later, on February 26, Butala submitted another kite demanding proof that he had ordered assaults on other inmates.  Plf.'s Ex. 16.  The response stated:

> The commissioner of corrections can place any offender in any facility within the D.O.C.  We have several offenders who are level 4 housed at MCF-OPH.  It appears your issue is with MCF-RC.  I encourage you to contact them with any further questions regarding your transfer.  I am not going to argue with you about this matter and I will not provide you with documents.

*Id.*

Butala then wrote a letter to the warden at MCF-Rush City, again demanding to be told the reason for his transfer and to be supplied with evidence proving that the reason was true.  Plf.'s Ex. 17.  In his letter, Butala noted that before the transfer, he had written a kite to the warden's office asking why he was being transferred in light of the fact that he had done nothing to warrant the transfer.  *Id.*  Butala then went on to say:  "Not only that, but I only had 19 points which is one point over medium custody status."  *Id.*  (It is unclear why Butala claimed to have only 19 custody points in this letter when his April 1, 2008 letter said that he had 22 custody points.)  The corrections program director at MCF-Rush City responded by stating that "[t]ransfers between facilities occur to ensure safe, secure and appropriate housing for offenders"

and that "[a]ssignment to a particular custody level does not grant an offender the right to be assigned to or remain at a particular facility."  Plf.'s Ex. 18.

Butala sent three more letters about his transfer to the MCF-Rush City warden.  Although only one of these letters is in the record, it is apparent that they all demanded to know why Butala had been transferred.  *See* Plf.'s Exs. 19, 20 (responses from warden to letters from Butala dated April 1 and April 13, 2009); Plf.'s Ex. 21 (April 22, 2009 letter from Butala demanding information about his transfer and threatening to sue if he does not receive it).  The warden responded to the first two of these three letters, reiterating that placement decisions are made for a variety of administrative reasons.  Plf.'s Exs. 19, 20.  In her final response, the warden stated that "[w]e have . . . responded to numerous kites and a grievance on this topic" and that "[t]his matter is closed."  Plf.'s Ex. 20.  Butala's final letter, to which he received no response, insisted that the matter was not closed:  "[Y]ou will not just tell me that this matter is closed.  It is not closed until you give me the information that I'm asking for."  Plf.'s Ex. 21.

Clearly, then, the focus of the correspondence that Butala sent in early 2009 was learning the reason for his March 2008 transfer to MCF-OPH.  Butala apparently perceived the transfer to be some sort of punishment for suspected misconduct, and he demanded that prison officials identify the misconduct and the evidence that they relied on in concluding that he had committed the misconduct.  At no time did Butala request any compensation or other remedy for the two assaults, as he does in this lawsuit.  Only once did Butala even mention his custody points, which is a major focus of this lawsuit.  And all of Butala's correspondence was informal; he never submitted a formal grievance and, obviously, did not appeal any denial of a formal grievance.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B.  Exhaustion

Under the Prison Litigation Reform Act of 1995 ("PLRA"), a prisoner may not bring a federal claim challenging prison conditions unless he has first exhausted the prison's administrative remedies:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  If a prisoner fails to exhaust a claim, that claim must be dismissed without prejudice.  *Davis v. Harmon*, 389 Fed. Appx. 587, 587-88 (8th Cir. 2010) (per curiam).  Even if the relief that the prisoner seeks — such as money damages — is not available through the administrative process, the prisoner must exhaust his administrative remedies so long as the process "could provide some sort of relief on the complaint stated . . . ." *Booth v. Churner*, 532 U.S. 731, 734 (2001).

To exhaust a claim, a prisoner must follow the procedures required by the prison's grievance procedure. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Determining whether a prisoner has exhausted a claim, therefore, entails determining whether he fully complied with his prison's grievance procedure. *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

1. Transfer

Butala alleges that defendants violated various of his constitutional rights by transferring him to a maximum-security facility even though he did not meet the custody-credit guidelines for incarceration at such a facility. Defendants move for summary judgment on this claim on the grounds that Butala failed to exhaust his administrative remedies.

There is no question that Butala grieved his transfer to MCF-OPH. Butala first submitted a letter and two kites to prison officials and then, when they would not agree to stop the transfer, Butala filed a formal grievance directly with the central-office grievance-appeal coordinator. On that basis, Butala contends that he has exhausted his claim that he should not have been transferred to MCF-OPH because his custody-credit level did not warrant incarceration in a maximum-security facility.

The problem with Butala's analysis, though, is that it ignores the *reasons* that he gave for filing a grievance about the transfer. The purpose of the PLRA's exhaustion requirement is to "allow[] a prison to address complaints about the program it administers before being subjected to suit . . . ." *Jones*, 549 U.S. at 219. A prison cannot "address complaints" about its actions

unless the inmate identifies the action and the nature of his complaint about the action.  If a prisoner complains of being served pork, and then sues prison officials because his reading materials were restricted, he has obviously not exhausted his administrative remedies, because he has not given prison officials an opportunity to address his objections to the restrictions on his reading materials.  Similarly, if a prisoner complains of being served pork because fatty foods worsen his coronary artery disease, and then sues prison officials because eating pork violates his religious beliefs, he has not exhausted his administrative remedies.  His grievance gave prison officials the opportunity to address his complaint about the impact of eating pork on his health, but it gave them no clue that he was claiming a First Amendment right not to be served pork and thus no opportunity to address that complaint.

This is not a question of specificity.  When a prisoner objects that $x$ action of prison officials is unlawful for $y$ reason — and the "prison's grievance procedures are silent or incomplete as to factual specificity" — then "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'"  *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).  Here, though, the problem is not that Butala objected that his transfer was unlawful for $y$ reason, but was not very specific in describing $y$.  Here, the problem is that Butala quite specifically objected that his transfer was unlawful for $y$ reason, but now seeks to sue defendants on the ground that his transfer was unlawful for $z$ reason — a reason that Butala never grieved, and thus never gave defendants an opportunity to address.

Butala claimed in his grievance that the transfer was in retaliation for his engaging in a romantic relationship with a staff member, and Butala claimed that, if he were transferred, his

life would be in danger.  If Butala were bringing such claims in this action, they would

unquestionably be exhausted.  But Butala is not bringing such claims in this action — or, if he is,

those claims are clearly not cognizable.

First, Butala did not allege in his complaint that his transfer was unlawful because it was

in retaliation for his engaging in a romantic relationship with a staff member —  most likely

because it is hard to imagine how it could be illegal for a prison to transfer a prisoner in

"retaliation" for such a romantic relationship.

Second, even if Butala's complaint could be construed to allege that defendants are liable

merely for putting him at risk by transferring him to MCF-OPH, Butala cannot obtain any relief

on that claim.  Butala is no longer incarcerated at MCF-OPH and, consequently, he cannot seek

an injunction requiring defendants to transfer him to a safer prison.  Moreover, Butala cannot

recover damages merely for being put *at risk* of an assault — as contrasted with recovering

damages for *being* assaulted.[8]  *Cf. C.L.C. v. Minneapolis Pub. Schs.*, No. 06-1161, 2007 WL

1812899, at *8 (D. Minn. June 21, 2007) ("C.L.C. cites no authority for the proposition that a

student is deprived of a constitutional right when a school district takes action that puts her at

risk of being sexually assaulted, when she is not, in fact, sexually assaulted or harmed in any

other way, and when she is not even aware of the risk.").

Butala's only cognizable claim relating to the transfer, then, is that it was unlawful to

transfer him to MCF-OPH because he had only 22 (or 19) custody-credit points.  Butala's

---

[8]Butala is, in fact, seeking to recover damages for the injuries that he suffered as a result of being assaulted.  But, as discussed below, although Butala grieved his *transfer* to MCF-OPH on the ground that it would put him at risk of being assaulted, he failed to grieve the *assaults themselves*, as he was required to do under the PLRA.

problem is that he never properly grieved this issue.  Neither Butala's pre-grievance kites nor his formal grievance said a word about his custody-credit points, and thus neither gave prison officials an opportunity to address Butala's complaint.

Butala's grievance was decided and signed on March 31, 2008, and he was notified of the decision by letter dated April 2, 2008.  Plf.'s Exs. 6, 9.  On April 1, 2008 — after the grievance had been decided and the file closed, but before Butala received formal notice of the decision — Butala submitted a letter in which he raised a number of complaints, including, for the first time, a complaint about his custody-credit points.  Plf.'s Ex. 8.  The appeal coordinator rejected this letter as an improper attempt to challenge the March 31 denial of his grievance, and referred him to DOC policy for proper grievance procedure.  Plf.'s Ex. 10.  Thus, the only document that raised the issue of custody-credit points and that was submitted in connection with a formal grievance was submitted *after* that grievance had been decided and was rejected as procedurally improper.  Although nothing prevented Butala from initiating a new grievance regarding his custody-credit points, Butala did not do so.

As described above, in early 2009 — almost a year after Butala grieved his transfer to MCF-OPH — Butala engaged in heated correspondence with prison officials, in which he demanded that they tell him their real reason for transferring him a year earlier.  In one of those letters — a February 2009 letter to the warden at MCF-Rush — Butala mentioned the custody-credit issue.  Plf.'s Ex. 17.  (Butala may have mentioned the issue in other informal letters and kites submitted during the same time period; the record is incomplete.)  But none of these materials even purports to be a formal grievance.  Butala's letters were not submitted on the proper form nor sent to the correct prison official.  Moreover, in these letters Butala did not

demand that he be transferred back to MCF-Rush City, but instead demanded that he be told the

real reason for his transfer to MCF-OPH and given documentation supporting that reason.

The Court therefore concludes that Butala has not exhausted the custody-credit issue.

Although Butala exhausted claims that the transfer was retaliatory and would put him in danger

(neither of which, for reasons explained above, are at issue in this lawsuit), that is not sufficient

to exhaust the claim regarding custody-credit points.  The claims are clearly distinct:  By raising

the issue of his custody-credit points, Butala is claiming the absolute right not to be incarcerated

at any maximum-security facility under any circumstances — regardless of whether he was

assigned to such a facility as an initial matter or transferred to such a facility from another prison.

By contrast, by claiming that the transfer was retaliatory and would put him in danger, Butala

was claiming that, under the particular circumstances, the particular transfer was unlawful.

Butala's grievance therefore failed to serve the purpose of "allowing a prison to address

complaints about the program it administers before being subjected to suit . . . ."  *Jones*, 549 U.S.

at 219.

A comparison with *Riccardo v. Rausch*, 375 F.3d 521 (7th Cir. 2004) is instructive.  In

*Riccardo*, a prisoner who was assaulted by another inmate filed a grievance whose main

objective was to have his attacker prosecuted.  *Id.* at 524.  The prisoner also stated, however, that

the prison administration "don't do there [sic] job" and that such assaults should "never happen

again."  *Id.*  Because the prisoner's statement was ambiguous — it could be read either as a

complaint that the prison failed to adequately punish the attacker or as a complaint that the prison

did not do enough to prevent the assault — the Seventh Circuit held that the grievance was

sufficient to exhaust a claim that prison officials were deliberately indifferent in failing to

prevent the assault. *Id.* As the Seventh Circuit said, however, "it is hard to imagine much less that a prisoner could do and still alert the prison . . . ." *Id.*

With respect to the custody-credit issue, Butala did not even do as much as the prisoner in *Riccardo*. Nothing in Butala's grievance could have alerted prison officials that Butala was contending that, even if the transfer was not retaliatory and even if he was kept safe at MCF-OPH, Butala nevertheless had an independent right not to be imprisoned in any maximum-security facility because of his custody-credit points. *Cf. Olivares v. United States*, 447 Fed. Appx. 347, 351-52 (3d Cir. 2011) (per curiam) (prisoner's claim for failure to provide knee brace was not exhausted by grievance concerning surgery and medical transfer). The Court therefore dismisses Butala's federal-law claims regarding his transfer for failure to exhaust.

### 2. Assault

Butala also claims that he is entitled to compensation for the injuries that he suffered when he was assaulted in January 2009 at MCF-OPH; specifically, Butala alleges that defendants must pay damages because they violated the Eighth and Fourteenth Amendments by knowingly failing to protect him from that assault.[9] But Butala never submitted any grievance with respect to this assault; his only formal grievance was about his transfer and was submitted in March 2008, which was ten months before the assault took place. It is therefore hard to understand how Butala could be considered to have exhausted his remedies with respect to the

---

[9]Butala makes this claim in Count 1 of his complaint. It is possible to read Count 1 as raising a claim as to both the December 2008 assault and the January 2009 assault. In moving for summary judgment, however, defendants interpreted Butala as raising only a claim with respect to the January 2009 assault (which required Butala to be hospitalized), and Butala did not disagree. In any event, there is no evidence that Butala filed a grievance with respect to either assault.

assault. *Cf. Leach v. Moore*, 240 Fed. Appx. 732, 733 (8th Cir. 2007) (per curiam) ("We also find that the district court properly dismissed the claim against Dr. DeCastro, because Leach did not contest defendants' assertion that the exhausted grievance in the record preceded the treatment from Dr. De Castro underlying the instant complaint.").

Butala nevertheless contends that his claims regarding the assault should be considered exhausted because the assault was related to his earlier grievance about the transfer.  It is true that Butala's earlier grievance complained that Butala would be in danger if he were transferred to MCF-OPH.  But Butala's March 2008 grievance sought protection from a risk; it asked prison officials to stop a transfer.  Butala's grievance did not seek compensation, treatment, or any other form of redress for injuries that had been suffered in a January 2009 assault.  Because Butala never filed a grievance with respect to the assault, the DOC had no opportunity to offer redress for the harm caused by the assault through the established grievance process.

Moreover, in arguing that defendants were deliberately indifferent to the risk of the January 2009 assault, Butala relies on a number of facts and circumstances that did not arise until long after his March 2008 grievance was resolved.  For example, Butala alleges that, in December 2008, he notified defendants that there was a "green light" on him; that defendants wrongly refused to help him because he could not provide specific names; that defendants wrongly placed him back in the general population on the same cell block as his earlier assailant despite knowing of the "green light"; and that the prison guard on duty at the time of his assault wrongly did nothing to prevent it.  Butala's failure to grieve the assault means that the DOC never had an opportunity to address any of these issues.

This is not to say that Butala was required to detail all of these circumstances in a grievance.  It is simply to point out that neither the harm about which Butala is suing nor the alleged proximate causes of that harm were even in existence when Butala filed his grievance in March 2008.  *Cf. Leach*, 240 Fed. Appx. at 733 (affirming dismissal for failure to exhaust because "the failures attributed to Dr. De Castro related to different time periods, to care received at a different prison, and to different wrongs").  The Court therefore concludes that Butala's federal claim relating to the assaults must be dismissed for failure to exhaust.

3.  Excusing Exhaustion

Butala argues that any failure to properly grieve his claims should be excused because prison officials prevented him from using the grievance procedure.  Because § 1997e(a) requires prisoners to exhaust "available" administrative remedies, a prisoner may be excused from exhausting administrative remedies if prison officials render those remedies "unavailable."  So, for example, exhaustion may be excused when prison officials fail to respond to the prisoner's request for grievance forms, *see Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001); when officials ignore the prisoner's attempts to grieve, *Nixon v. Sanders*, 243 Fed. Appx. 197, 199 (8th Cir. 2007) (per curiam); or when officials use threats to prevent the prisoner from grieving, *Ponder v. Wackenhut Correctional Corp.*, 23 Fed. Appx. 631, 631-32 (8th Cir. 2002) (per curiam).

It is important to emphasize that the question under § 1997e(a) is not whether a prisoner *perceived* administrative remedies as being unavailable, but whether administrative remedies were *in fact* unavailable. "[Section] 1997e(a) does not permit the court to consider an inmate's merely subjective beliefs, logical or otherwise, in determining whether administrative procedures

are 'available.'"  *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002) (en banc).  So, for example, it is not enough that officials told the prisoner that all grievances would be handled informally, *see Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005); or that officials ignored the prisoner's request for information about the grievance process, *Hahn v. Armstrong*, 407 Fed. Appx. 77, 79 (8th Cir. 2011) (per curiam).  Instead, there must be evidence that an official "thwarted an attempt to initiate the procedures or . . . made it impossible for [the prisoner] to file grievances."  *Gibson*, 431 F.3d at 341; *see also Washington v. Uner*, 273 Fed. Appx. 575, 577 (8th Cir. 2008) (per curiam) ("while it is undisputed that an OSI investigator warned Washington not to reveal his involvement with OSI, we cannot say that this warning thwarted Washington's right to utilize the grievance procedure").

There is no evidence in the record that any prison official thwarted any attempt by Butala to file a grievance.  At best, the evidence shows that, in response to Butala's many informal letters and kites, officials told him that he had already grieved certain issues relating to his transfer and that his grievance of his transfer was "closed."  *See*, *e.g.*, Plf.'s Ex. 20.  As an initial matter, the record belies any claim that this assertion led Butala to sleep on his rights; to the contrary, Butala vigorously insisted that the matter was *not* closed and would not be closed until he was told the true reason for his transfer (which, incidentally, is not the relief that he is seeking in this lawsuit).  But in any event, these circumstances are similar to those in *Gibson*, in which prisoners were told by both prison and medical personnel "that they should voice all complaints regarding medical care informally to medical personnel."  *Gibson*, 431 F.3d at 341.  The Eighth Circuit nevertheless held that, because the prisoners were not actually prevented from following the formal grievance procedure, the prisoners' failure to exhaust that procedure was not excused.

*Id.* Here, just as in *Gibson*, there is no evidence that Butala was prevented from using the grievance procedure by any prison official.  His failure to do so with respect to his custody-credit and assault claims therefore requires dismissal of those claims.

Finally, Butala argues that there are "special circumstances" justifying his failure to grieve, citing *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004).  In *Hemphill*, the Second Circuit held that a prisoner's reliance on a reasonable interpretation of an unclear grievance procedure may justify the prisoner's failure to follow the rules "to the letter . . . ."  *Id.* at 690. Leaving aside the fact that the Eighth Circuit does not appear to have adopted any such rule, Butala does not cite any ambiguous language in the DOC's written grievance policy or contend that he reasonably, but mistakenly, misinterpreted the policy.  Butala's subjective belief that he had properly exhausted his claims does not excuse his failure to exhaust.  *Lyon*, 305 F.3d at 809.

### C.  Unnamed Defendants

Butala brings claims not only against the named defendants who have moved for summary judgment, but also against two unnamed defendants:  (1) a correctional sergeant referred to as "Jane Doe" and (2) a prison official referred to as "John or Jane Doe."[10]  Compl. ¶¶ 16-17.  Because failure to exhaust administrative remedies is an affirmative defense, *see Jones*, 549 U.S. at 216, the Court cannot at this time dismiss the federal claims against the unnamed defendants on that basis.  The unnamed defendants do not appear to have been served or to have entered an appearance, and thus they obviously have not raised the affirmative defense

---

[10]The docket lists three unnamed defendants because it treats "John or Jane Doe" as two different people.  The complaint makes it apparent, however, that the unnamed prison official is a single person.  *See* Compl. ¶¶ 17, 21(d).

of failure to exhaust.  *See Leach*, 240 Fed. Appx. at 733 (district court erred in dismissing claims for failure to exhaust against subset of defendants who did not seek dismissal on that ground).

In their motion for summary judgment, the named defendants suggest that the claims against the unnamed *prison official* should be dismissed because they are conclusory and because they are too vague to permit the official to be identified.  ECF No. 13 at 9 n.2.  Butala did not respond to this argument; instead, he contended that the claims against the unnamed *correctional sergeant* should not be dismissed.  ECF No. 21 at 7 n.2.  The allegations against the unnamed correctional sergeant are specific enough to permit her to be identified through discovery.  The Court therefore must give Butala an opportunity to do so.  *See Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985).

The allegations against the unnamed prison official are less specific, but it is reasonably clear that Butala means to sue the prison official who made the decision to transfer him to MCF-OPH.  That official's identity should be reasonably ascertainable, and Butala must therefore also be given an opportunity to identify him or her.  As for defendants' contention that Butala's claims against that official are conclusory, the Court disagrees:  Butala alleges (and the documents submitted in connection with the current motion demonstrate) that he notified the DOC that he feared for his safety if he were transferred to MCF-OPH, and the record reflects the involvement of various prison officials in responding to his grievance and other complaints about the transfer.  Butala thus has a plausible claim that the prison official responsible for his transfer was aware that Butala would be in danger at MCF-OPH.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (to state a claim, complaint must contain enough facts to be plausible).

If Butala wishes to pursue this action against the unnamed defendants, he must find out

who they are, file and serve an amended complaint that identifies them by name, and file proof of

service of the summons and amended complaint on them.  This is likely to be a largely fruitless

exercise, however.  If the unnamed defendants move for summary judgment on the basis of

Butala's failure to exhaust administrative remedies, the Court will almost certainly grant that

motion, unless Butala introduces evidence of exhaustion that is not currently before the Court.

And, once the Court has dismissed all of Butala's federal claims, it will decline to exercise

supplemental jurisdiction over his remaining state-law claim.  *See* 28 U.S.C. § 1367(c)(3);

*Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005) (in the usual case in which the

district court has dismissed all claims over which it had original jurisdiction before trial, the

balance of factors relevant to the exercise of supplemental jurisdiction weigh in favor of

declining to exercise jurisdiction over remaining state-law claims).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.   The motion of defendants Cari Gerlicher, Michael Smith, Joe Durocher, and

Barbara Stoltz for summary judgment [ECF No. 11] is GRANTED.

2.   Counts 1 and 2 of plaintiffs' complaint [ECF No. 2] are DISMISSED WITHOUT

PREJUDICE as to those defendants.

Dated:  January 22, 2014                          s/Patrick J. Schiltz
                                                  Patrick J. Schiltz
                                                  United States District Judge

-22-